ATTORNEYS FOR APPELLANTS
William R. Groth
Fillenwarth Dennerline Groth & Towe, LLP
Indianapolis, Indiana

Karen Celestino-Horseman
Thomas N. Austin
Bruce G. Jones
Austin & Jones, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Heather L. Hagan
Deputy Attorney General

Ashley E. Tatman
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
[see attachment]



**FILED**

CLERK
of the supreme court,
court of appeals and
tax court

---

# In the
# Indiana Supreme Court

---

No. 49S02-1001-CV-50

---

LEAGUE OF WOMEN VOTERS OF INDIANA, INC., AND
LEAGUE OF WOMEN VOTERS OF INDIANAPOLIS, INC.,       *Appellants (Plaintiffs below),*

v.

TODD ROKITA, IN HIS OFFICIAL CAPACITY
      AS INDIANA SECRETARY OF STATE,       *Appellee (Defendant below).*

---

Appeal from the Marion Superior Court, No. 49D13-0806-PL-27627
The Honorable S.K. Reid, Judge

---

On Transfer from the Indiana Court of Appeals, No. 49A02-0901-CV-40

---

**June 30, 2010**

**Dickson, Justice.**


The sole plaintiffs in this case, the Indiana State and Indianapolis chapters of the League of Women Voters, brought this action seeking a declaratory judgment that the Indiana Voter ID Law violates Article 2, Section 2, and Article 1, Section 23 of the Indiana Constitution. The trial court granted the defen-

dant's motion to dismiss, concluding that the Voter ID Law did not violate either constitutional provision. The Court of Appeals reversed. League of Women Voters of Ind., Inc. v. Rokita, 915 N.E.2d 151 (Ind. Ct. App. 2009). We granted transfer, thereby automatically vacating the opinion of the Court of Appeals and accepting jurisdiction over the appeal, pursuant to Indiana Appellate Rule 58(A). Determining that this case presents only facial challenges to the constitutionality of the Voter ID Law, we now affirm the trial court's dismissal of the complaint, but without prejudice to future as-applied challenges by any voter unlawfully prevented from exercising the right to vote.

The relief the plaintiffs seek is a declaration that it was beyond the power of the legislature to require any voters to identify themselves at the polls using a photo ID.[1] Voters have long been required to identify themselves at the polls by announcing and signing their names. Neither of the constitutional provisions the plaintiffs invoke prevents the legislature from promulgating a new way for voters to identify themselves. It is within the power of the legislature to require voters to identify themselves at the polls using a photo ID. The plaintiffs' claim for relief cannot be granted and dismissal was appropriate. No individual voter has alleged that the Voter ID Law has prevented him or her from voting or inhibited his or her ability to vote in any way.[2] Our decision today does not prevent any such voter from challenging the Law in the future.

In 2005, an enactment of the Indiana General Assembly, Public Law 109-2005, referred to by the parties as the Indiana Voter ID Law, made several modifications to Indiana's election and motor vehicle laws. This Law was challenged in federal court where the plaintiffs claimed that it violated the First and Fourteenth Amendments of the United States Constitution as well as 42 U.S.C. § 1971, and Article 2, Sections 1 and 2 of the Indiana Constitution. The District Court rejected the plaintiffs' challenges and upheld the law, and its judgment was upheld on appeal. Ind. Democratic Party v. Rokita, 458 F. Supp. 2d 775 (S.D. Ind. 2006), *aff'd sub nom.* Crawford v. Marion County Election Bd., 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 128 S. Ct. 1610, 170 L. Ed. 2d 574 (2008).

---

[1] "Plaintiffs . . . pray for the following relief . . . [a] declaration by this Court that the Indiana Photo ID Law violates Art. 2, §2 and Art. 1, §23 of the Indiana Constitution." Amended Complaint for Declaratory Judgment ("Complaint") at 8–9; Appellants' App'x at 15–16.

[2] While an admittedly different type of claim, we note that when Indiana Democrats challenged the 1980 legislative apportionment plan in two lawsuits, there were seven individual plaintiffs in one lawsuit and eight in the other claiming impingement by the challenged statute. *See* Bandemer v. Davis, 603 F. Supp. 1479, 1482 (S.D. Ind. 1984), *rev'd*, Davis v. Bandemer, 478 U.S. 109, 106 S. Ct. 2797, 92 L. Ed. 2d 85 (1986).

In both the federal litigation and in the present appeal, the challenges to the Voter ID Law center on its requirement, as summarized by Justice Stevens for the United States Supreme Court, that:

> . . . citizens voting in person on election day, or casting a ballot in person at the office of the circuit court clerk prior to election day, [must] present photo identification issued by the government. . . . [T]he statute applies to in-person voting at both primary and general elections. The requirement does not apply to absentee ballots submitted by mail, and the statute contains an exception for persons living and voting in a state-licensed facility such as a nursing home. A voter who is indigent or has a religious objection to being photographed may cast a provisional ballot that will be counted only if she executes an appropriate affidavit before the circuit court clerk within 10 days following the election. A voter who has photo identification but is unable to present that identification on election day may file a provisional ballot that will be counted if she brings her photo identification to the circuit county clerk's office within 10 days. No photo identification is required in order to register to vote, and the State offers free photo identification to qualified voters able to establish their residence and identity.

Crawford, 553 U.S. at 185–86, 128 S. Ct. at 1613–14, 170 L. Ed. 2d at 580–81 (internal citations and footnotes omitted).

In June 2008, the plaintiffs instituted the present state court action challenging the Voter ID Law.[3] When their constitutional claims were rejected and their action dismissed by the trial court, the plaintiffs instituted this appeal, in essence claiming violations of Article 2, Section 2, and Article 1, Section 23 of the Indiana Constitution. The plaintiffs seek a general judicial nullification of the Indiana Voter ID Law. This case presents facial but not as-applied constitutional challenges. The amended complaint does not seek individual relief under any claim that the Voter ID Law is unconstitutional as applied to either of the plaintiffs but rather seeks only a general declaration that "the Indiana Photo ID Law violates Art. 2, §2 and Art. 1, §23 of the Indiana Constitution." Appellants' App'x at 16. Among their assertions at trial and on appeal, the plaintiffs-appellants recite a claim that the Voter ID Law is unconstitutional as applied to some persons but make no claim that the Law is unconstitutional as applied to either of the plaintiffs-

---

[3] The plaintiffs' complaint makes the following allegations: (1) the Voter ID Law prevented or discouraged an indeterminate number of citizens from voting; (2) the votes of 32 persons who did not produce the requisite photo ID were not counted in the 2007 municipal election in Marion County; (3) the votes of 12 nuns who did not produce the requisite photo ID were not counted in the 2008 primary election in St. Joseph County; (4) the Law has prevented an indeterminate number of citizens from voting whose requisite photo ID was lost or stolen or who forgot to bring their requisite photo ID to the polls; and (5) the Law has discouraged or dissuaded an indeterminate number of citizens from voting because of its "extra-constitutional requirements." Complaint ¶¶ 17–20; Appellants' App'x at 13–14. None of these allegations creates any basis for a declaration that the State may not require any voters to identify themselves at the polls using photo ID. Some of these allegations, if substantiated, may entitle specific voters to more tailored relief, but none has been sought in the plaintiffs' complaint.

3

appellants, nor do they seek individualized exemptions from the Law's requirements. *See* [League of Women Voters of Indiana, Inc.] Response in Opposition to Defendant's Motion to Dismiss, Appellants' Supp. App'x at 35–37; Appellants' Br. at 43–45. We therefore treat this case as alleging only claims of facial unconstitutionality and do not address the availability of claims alleging that the Law is unconstitutional as applied.

The plaintiffs argue that it is beyond the power of the legislature to require any voters to identify themselves at the polls using a photo ID for three reasons:

(1) The requirements of the Voter ID Law constitute a "qualification for voting" in violation of the Indiana Constitution which limits qualifications for voting to those specified in Article 2, Section 2;[4]

(2) The Voter ID Law violates the prohibition on granting privileges or immunities to any citizen or class of citizens that do not equally belong to all citizens on the same terms (the "Privileges and Immunities Clause") because it does not require a class of citizens, voters casting absentee ballots by mail, to comply with its provisions;[5] and

(3) The Voter ID Law violates the Privileges and Immunities Clause because it does not require a class of citizens, voters who both live and vote in a state licensed care facility, to comply with its provisions.[6]

**Part I. Entitlement to Vote – Article 2, Section 2**

Emphasizing that voting is a fundamental right of all voters who meet the enumerated qualifications in Article 2, Section 2 of the Indiana Constitution, the plaintiffs contend that the only permissible voting qualifications are those explicitly established in Article 2 and that the Voter ID Law is unconstitutional because (a) it imposes a new substantive qualification on the right to vote; (b) it is not a registration law authorized by Article 2, Section 14(c) of the Indiana Constitution; and (c) it is not uniformly applicable to all voters. With respect to these arguments, the following provisions of the Indiana Constitution are relevant:

---

[4] Complaint ¶¶ 12–16; Appellants' App'x at 11–13.
[5] Complaint ¶¶ 23–25; Appellants' App'x at 14–15.
[6] Complaint ¶ 26; Appellants' App'x at 15.

Article 2

Suffrage and Election

Section 1.  All elections shall be free and equal.

Section 2.

    (a) A citizen of the United States, who is at least eighteen (18) years of age and who has been a resident of a precinct thirty (30) days immediately preceding an election may vote in that precinct at the election.
    (b) A citizen may not be disenfranchised under subsection (a), if the citizen is entitled to vote in a precinct under subsection (c) or federal law.
    (c) The General Assembly may provide that a citizen who ceases to be a resident of a precinct before an election may vote in a precinct where the citizen previously resided if, on the date of the election, the citizen's name appears on the registration rolls for the precinct.

\* \* \*

Section 14.

\* \* \*

    (c) The General Assembly shall provide for the registration of all persons entitled to vote.

## A.

The plaintiffs acknowledge that the Indiana General Assembly has the power to regulate the administration of elections but argue that the Voter ID Law is not merely a procedural regulation but rather "adds a new substantive voting qualification not authorized by the Indiana Constitution."  Appellants' Br. at 18.  This contention was presented and rejected in the federal litigation.  Judge Barker, whose judgment was subsequently affirmed by the Seventh Circuit and by the United States Supreme Court in a 6-3 vote, explained:

> The fact that Plaintiffs prefer alternative procedures to the photo identification does not create a Constitutional violation in requiring the latter.  Nor is a Constitutional violation committed every time the General Assembly enacts a new voting regulation since, as we have previously noted, under Indiana law "the Legislature has power to determine what regulations shall be complied with by a qualified voter in order that his ballot may be counted, so long as what it requires is not so grossly unreasonable that compliance therewith is practically impossible."  Simmons v. Byrd, 192 Ind. 274, 136 N.E. 14, 17–18 (Ind. 1922).  Accordingly, Plaintiffs have failed to demonstrate that [the Voter ID Law] violates Indiana Constitution Article 2, section 2.

Ind. Democratic Party, 458 F. Supp. 2d at 843. A federal court's interpretation of Indiana law is not binding on Indiana state courts. *See* Evan v. Poe & Assocs., 873 N.E.2d 92, 103 (Ind. Ct. App. 2007), *trans. not sought*; Burk v. Heritage Food Serv. Equip., Inc., 737 N.E.2d 803, 812 n.1 (Ind. Ct. App. 2000), *trans. not sought*. In addition, while the doctrine of collateral estoppel precludes parties "from raising issues in state court that have been finally determined as to the same parties in previous federal actions," Endres v. Ind. State Police, 809 N.E.2d 320, 321 (Ind. 2004), we do not have the same parties in the present litigation as in the federal litigation. Indiana Secretary of State Todd Rokita was and is a defendant in both cases, but the plaintiffs here were not parties in the federal lawsuit.

To support their claim that the Voter ID Law created prohibited voter qualifications rather than permissible election regulations, the plaintiffs argue that the legislature may not alter the voting qualifications established by the Indiana Constitution and that the Voter ID Law is not a permissible procedural regulation but instead is a statute that imposes a new property qualification and arbitrary, burdensome, and exclusionary conditions on the right to vote of constitutionally eligible voters.

The plaintiffs rely primarily upon the early case of Morris v. Powell, 125 Ind. 281, 25 N.E. 221 (1890). At the time Morris was decided, the Indiana legislature had not yet enacted a general voter registration law, although authorized in 1881 to do so by an amendment to Article 2, Section 2. A statute was enacted in 1889 that (a) required certain Indiana residents absent from Indiana for six months or more or who had not resided in one county for six months before an election to register in their home county three months before the election and to present a certified copy of such registration at the time of voting, and (b) required a voter absent from Indiana for six months or more on state or federal government business to produce when voting a certificate from the county auditor verifying that the voter's name had continuously "been upon the tax duplicate of said county for the purpose of taxation, during his absence from the State, and that he is still a taxpayer in said county." *Id.* at 283, 25 N.E. at 222. This latter requirement operated to prevent voting by such persons absent on government business if they did not own taxable property in the county and were more than fifty years old.[7] Morris was an action brought against a county

---

[7] This is explained in Morris as follows:

> None of the names of voters except able-bodied men, between the ages of twenty-one and fifty years, and persons owning taxable property in the county, properly appear upon the tax duplicate, and are not taxpayers in the county. So that a voter over fifty years of age, being absent on business of the State or United states, and owning no taxable property in

auditor to enjoin the payment for books furnished for registering votes under provisions of the 1889 statute. The Morris Court identified the question presented as whether the legislature can impose the challenged obligations "on the class of voters therein specified, and to another class add a qualification not required by the Constitution to entitle them to vote." *Id.* at 286, 25 N.E. at 223. The Court declared that the legislature lacked the authority to require any voter to own taxable property within the county and held that the challenged statute, in requiring a special registration of voters who may be absent from Indiana for six months, was "both unreasonable and not impartial." *Id.* at 294, 25 N.E. at 225. It concluded:

> The authorities universally hold that registration laws must be impartial, uniform and reasonable, giving to all who have a right to vote a fair and reasonable opportunity to exercise such right.
> The Constitution not only confers upon the General Assembly the power to make illegal voting an impossibility by a proper system of registration, but it makes it the imperative duty of that body to exercise that power. The imposition of unauthorized burdens and qualifications not authorized by the Constitution upon a part of the citizens of the State is not an exercise of that power, and while we would regret to declare void any law having for its object the purity of elections, we can not so far forget our duty as to uphold a law so plainly in conflict with the fundamental law of the State as the section of the law under consideration.

*Id*. at 296, 25 N.E. at 226. The plaintiffs argue that the government identification card with an expiration date and a photograph, required by the Voter ID Law, is equivalent to the county auditor certificate found to be unconstitutional in Morris. Such government identification, they assert, should be considered an impermissible statutory "qualification" to vote, and thus violative of Section 2, "because it imposes an unnecessary and arbitrary burden on some voters." Appellants' Br. at 21–22.


Defending the Voter ID Law, the defendant counters that the Voter ID Law "is merely a regulation of election procedures designed to ensure fair elections, not an alteration of voter qualifications." Appellee's Br. at 13. He points to Article 2, Section 1 of the Indiana Constitution, which provides that all elections "shall be free and equal," and argues that the General Assembly has the power to protect the rights of citizens to "a fair and reliable electoral system in which their individual votes are not diluted by the fraudulently cast votes of others." *Id.* He contends that the requirements of the Voter ID Law are valid and reasonable means of enforcing the qualifications established in Article 2, Section 2. The defendant stresses that in Morris the statutory provisions were not invalidated because they required some voters to

---

> the county, is not a taxpayer in the county, and he could not procure such a certificate from the county auditor, and on voting, or attempting to vote, he would by this section be guilty of a felony.

Morris, 125 Ind. at 287, 25 N.E. at 223.

produce a document proving they complied with the valid existing constitutional qualifications of Article 2, Section 2. Rather, the provisions were invalidated in Morris "because they required documentation of some *other* extra-constitutional qualification to vote, *i.e.*, 90-day residency and property ownership." *Id.* at 23. Citing Simmons v. Byrd, 192 Ind. 274, 136 N.E. 14 (1922), the defendant asserts that Article 2, Section 2 does not provide "an exhaustive list of possible impediments to voting." Appellee's Br. at 15.

Between 1881 and 1921, Article 2, Section 2 set forth the qualifications for voting, followed by the phrase "if he shall have been duly registered according to law." Ind. Const. art. 2, § 2 (1881). Another provision added in 1881 expressly required the Indiana General Assembly to "provide for the registration of all persons entitled to vote." Ind. Const. art. 2, § 14 (1881). In 1921, the voter qualifications enumerated in Section 2 of Article 2 were altered (in part to include women), but the revision omitted the former concluding condition "if he shall have been duly registered according to law."[8] Ind. Const. art. 2, § 2 (1921).

In Simmons, the plaintiff challenged various statutes that required voters to register before taking part in elections, his claim based largely on the 1921 amendment's elimination of the registration clause from Section 2 of Article 2. The principal claim in Simmons was that, without the registration clause, Section 2 was violated by the statutory language that prohibited persons from voting unless registered and subjected such unregistered voters to be challenged and their votes excluded. In Simmons, this Court upheld the registration provisions, emphasizing that the Indiana Constitution requires that "[a]ll elections shall be free and equal." Ind. Const. art. 2, § 1. It quoted with express approval from an opinion of the Illinois Supreme Court, stating:

> If there is a provision, that all persons, possessing certain qualifications, shall be entitled to vote, there is also a provision, that all elections shall be free and equal. It is as much the duty of the legislature to pass measures for carrying the latter as for carrying the former provision, into effect. . . . When the ballot-box becomes the receptacle of fraudulent votes, the freedom and equality of elections are destroyed.

Simmons, 192 Ind. at 285, 136 N.E. at 17–18 (quoting People v. Hoffman, 116 Ill. 587, 616, 5 N.E. 596, 611 (1886)). Simmons also noted that, despite the omission of the registration clause from Section 2 of

---

[8] Further amendments in 1976, 1984, and 1998, resulting in the present language of Section 2, most significantly operated to lower the age qualification from 21 to 18 and to reduce the minimum residency requirement from six months to thirty days.

Article 2, a separate voter registration provision was present in the then-existing language of Section 14 of Article 2, which "authorizes and commands . . . for the registration of all persons entitled to vote." 192 Ind. at 282, 136 N.E. at 16 (internal quotation marks omitted). Simmons did not find Morris to be an impediment to the legislature's authority to regulate elections. Upholding a statutory requirement for voters to register twenty-nine days before the election, this Court forcefully concluded:

> Being charged by the constitution with the duty to "provide for the registration of all persons entitled to vote," and to enact such laws governing registration and the holding of elections that "all elections shall be free and equal," the legislature has power to determine what regulations shall be complied with by a qualified voter in order that his ballot may be counted, so long as what it requires is not so grossly unreasonable that compliance therewith is practically impossible. . . . [S]ince the legislature has power to provide by law for the registration of all voters, it has power to exclude from the privilege of voting those persons who refuse or neglect to register a reasonable number of days before the election.

Id. at 286, 136 N.E. at 18.

As declared in Morris and emphatically reasserted in Simmons, "the General Assembly has the power to enact a law providing for a uniform system of registration of all voters" and "the duty . . . to enact a law providing a reasonable, uniform and impartial system for the registration of all voters." Morris, 125 Ind. at 286, 25 N.E. at 222–23, *quoted with approval in* Simmons, 192 Ind. at 282, 136 N.E. at 16. As to its language suggesting consideration of election regulation legislation as analogous to voter qualifications, Morris must be viewed in its historical context. The Court in Morris was confronted with the legislature's failure to enact a general voter registration law despite constitutional authorization and then its adoption of an incomplete and selective registration system, one that operated to disqualify certain voters for lack of property ownership. We find the essential holding from Morris and Simmons is that reasonableness and uniformity are required in the regulation of elections by means of a system of registration. We do not read Simmons as granting a blanket authorization for the legislature to enact any voting regulation it sees fit.

The plaintiffs are correct that the legislature may not by statutory enactment add a substantive qualification to the right to vote assured by Article 2. In our view, however, the Voter ID Law's requirement that an in-person voter present a government-issued photo identification card containing an expiration date is merely regulatory in nature. The voter qualifications established in Section 2 of Article 2 relate to citizenship, age, and residency. Requiring qualified voters to present a specified form of identification is

9

not in the nature of such a personal, individual characteristic or attribute but rather functions merely as an election regulation to verify the voter's identity.  When the United States Supreme Court reviewed the Indiana Voter ID Law, the lead opinion, written by Justice Stevens on behalf of himself, Chief Justice Roberts, and Justice Kennedy, pointed out that Congress "believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology."  Crawford, 553 U.S. at 193, 128 S. Ct. at 1618, 170 L. Ed. 2d at 585.[9] Justice Stevens quoted with approval from the report issued by the Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker, III, which emphasized: "The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.  Photo [identification cards] currently are needed to board a plane, enter federal buildings, and cash a check.  Voting is equally important."  Id. at 194, 128 S. Ct. at 1618, 170 L. Ed. 2d at 585–86 (quoting Building Confidence in U.S. Elections § 2.5 (Sept. 2005), App. 136–137 (Carter-Baker Report)).

We conclude that the Indiana Voter ID Law's photo identification card requirements are in the nature of an election regulation and, as such, must satisfy Indiana's requirements of uniformity and reasonableness.  But the requirements of the Voter ID Law are not, as the plaintiffs urge, unconstitutional as additional substantive voter qualifications.

## B.

As an additional argument claiming that the Voter ID Law violates Article 2, Section 2, the plaintiffs assert that the law is not uniformly applicable to all voters.  We augment this argument to also consider both the requirements uniformity and reasonableness.

The plaintiffs contend that the Voter ID Law is not universally applicable to all voters because it does not apply to voters who mail in an absentee ballot or those who live in a state licensed care facility housing the voter's polling place.  They argue that, to obtain the required Indiana photograph identifica-

---

[9] In the United States Supreme Court, Justice Stevens wrote the lead opinion, in which Chief Justice Roberts and Justice Kennedy concurred; Justice Scalia wrote a concurring opinion, joined by Justices Thomas and Alito; Justice Souter wrote a dissenting opinion, joined by Justice Ginsburg; and Justice Breyer wrote a separate dissent.

tion card, "a would-be voter must present the original or certified copy of her birth certificate, a certificate of naturalization, a U.S. Veteran's photo identification, a U.S. military photo identification, or a U.S. passport," many of which involve significant fees and/or hardship to obtain. Appellants' Br. at 22–23. The plaintiffs assert that these requirements make the Voter ID Law "burdensome, exclusionary and disqualifying as to some voters," particularly non-drivers and college students. *Id.* at 23.

As to uniformity, we acknowledge that the Voter ID Law creates exceptions to its general requirement for government-issued photo identification as to mail-in absentee voters and for voters living in state licensed care facilities which house the voter's polling place. These exceptions, however, do not undermine the uniformity of the photo identification requirement for in-person voting. They apply only with respect to special alternative voting accommodations in which the photo identification requirement would be impracticable, unnecessary, or of doubtful utility. Such special exceptions no more create a fatal lack of uniformity in the Voter ID Law than do the statutory provisions authorizing mail-in absentee voting, early voting, and other accommodations that allow voting apart from in-person voting at regular polling places on election day invalidate Indiana's general election scheme for non-uniformity. They represent specific legislative regulations associated with additional accommodations extended by the legislature to provide alternatives for voters for whom in-person voting on election day would be difficult or impossible.

We are not persuaded that the photo identification requirements in the Voter ID Law are so unreasonable as to violate Article 2. The Law authorizes and provides guidelines to the Indiana Bureau of Motor Vehicles for the issuance of non-driver voter identification cards. Ind. Code §§ 9-24-16-1, 9-24-16-2, 9-24-16-3.5. The Bureau must issue an identification card to an individual who applies for a card, is a resident of Indiana, and presents documentary evidence to verify the individual's name, date of birth, address, social security number, and legal presence in the United States. *See* Ind. Code §§ 9-24-16-1, 9-24-16-2, 9-24-16-3.5. Under regulations promulgated by the Bureau, an individual must provide documents to establish (1) identity, which includes full legal name and date of birth; (2) lawful status in the United States, which can be shown by a birth certificate, passport, or one of several other documents; (3) residency in Indiana; and (4) a social security number. 140 Ind. Admin. Code 7-1.1-3. To assist individuals in the process and to prevent the necessity for return trips to a Bureau branch, the Bureau has created an online list of the documents that can be used. The Bureau also has a customer service telephone line to as-

11

sist people in retrieving the necessary documents. Furthermore, the Bureau may grant exceptions or use other verifiable documentation if an applicant is reasonably unable to gather the necessary documents. 140 I.A.C. 7-1.1-3(e). Finally, the Bureau has established a system by which it can issue an interim identification card to allow an individual to vote while the Bureau conducts its verification of the application for a permanent identification card. 140 I.A.C. 7-1.2-1.

We share the assessment expressed by Justice Stevens that "we cannot conclude that the [Indiana Voter ID] statute imposes 'excessively burdensome requirements' on any class of voters" and that, considering the statute's broad application to all Indiana voters, "it 'imposes only a limited burden on voters' rights.'" Crawford, 553 U.S. at 202–03, 128 S. Ct. at 1623, 170 L. Ed. 2d at 590–91 (internal citations omitted).[10] The burdens occasioned by the Voter ID Law serve numerous substantial interests relating to the use of technology to modernize and to protect the integrity and reliability of the electoral process. We find that the requirements of the Indiana Voter ID Law, while enhancing the procedural burdens associated with the voting process, are not sufficiently unreasonable.

Because it is not alleged in the present case, we need not determine whether an as-applied challenge may be maintained if a claim were presented and proven that reasonable government assistance was not actually available to adequately relieve either the cost or hardship of obtaining photo ID.

We therefore reject the plaintiffs' claims of facial unconstitutionality under Article 2 of the Indiana Constitution.

---

[10] One *amicus* calls to our attention an academic study showing that in Indiana's 92 counties in the November 2008 general election, 1,039 provisional ballots were cast because a voter lacked the required photo identification. Of those 1,039 votes, 137 subsequently qualified and were counted after the election. That is, 902 provisional ballots cast because a voter lacked the requisite photo ID were not counted. Br. of *Amici Curiae* Lonna Rae Atkeson et al. [political scientists who study elections] at 10 (citing Michael J. Pitts & Matthew D. Neumann, *Documenting Disenfranchisement: Voter Identification at Indiana's 2008 General Election*, J.L. & Pol. (forthcoming 2010)). The *amicus* brief does not indicate the extent to which, if any, the study presents information on why these voters lacked photo ID—whether they had been unable to obtain it or simply forgot to bring it to the polls or were ineligible to vote. And, of course, this number does not reflect any voters who simply did not come to the polls because they did not have the requisite photo ID. By way of reference, in the November 2008 general election, of the 4,514,759 registered voters, 2,805,986 (62%) voted, 2,143,813 in person and 662,443 by absentee ballot. Indiana Secretary of State Website: http://www.in.gov/sos/elections/2008_Municipal_Registration_and_Turnout.pdf (last visited June 29, 2010).

**Part II.  Equal Privileges and Immunities – Article 1, Section 23**

The plaintiffs contend that the Voter ID Law violates the Equal Privileges and Immunities Clause of the Indiana Constitution: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."  Ind. Const. art. 1, § 23.[11]  The plaintiffs' complaint alleges two examples of unequal treatment claimed as violations of Section 23: (1) requiring photo identification of in-person but not mail-in absentee voters, and (2) exempting from the photo identification requirement voters residing in state licensed care facilities at which a precinct polling place is located.[12]

In Collins v. Day, 644 N.E.2d 72 (Ind. 1994), this Court engaged in a comprehensive review of the history and purposes animating the adoption of Section 23 as part of Indiana's 1851 Constitution and of the subsequent case law, particularly our early decisions that were contemporaneous with its adoption and which were "accorded strong and superseding precedential value." *Id.* at 77.  Synthesizing history, text, and subsequent case law, we adopted a superseding analytical formulation that, when statutes grant unequal privileges or immunities to differing persons or classes of persons, the Equal Privileges and Immunities Clause imposes two requirements: "First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics [that] distinguish the unequally treated classes.  Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated." *Id.* at 80.  In addition, "in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion." *Id.*

The plaintiffs' assertion that the Voter ID Law violates Section 23 is based on three principal con-

---

[11] The history associated with Section 23 and the value of equality for Indiana citizens is helpfully chronicled and discussed in the Brief of Professors Madison, Levinson, and Etcheson as *Amici Curiae* in Support of Appellants.

[12] On appeal, the plaintiffs attempt to raise additional claims, namely, (a) accepting military identification cards with the stated expiration date of "INDEF" but not identification cards issued by the Veterans Administration that lack any expiration designation; (b) accepting an Indiana photo identification card but not a government-issued Medicare identification card that lacks a photograph and expiration date; (c) permitting voting without a photo identification by persons with faith-based objections to being photographed; (d) creating a system where obtaining an identification card is more burdensome for some than other Indiana citizens; and (e) accepting identification cards issued by some but not all Indiana colleges and universities.  Because these claims were not presented to the trial court, we decline to address them on appeal.

tentions: (a) that the photo identification requirement is not reasonably related to the inherent characteristics that distinguish in-person and absentee voters; (b) that, among the in-person voters, variations in the photo identification requirement are not reasonably related to the differences among affected voters; and (c) that "for all these classifications, the preferential treatment is not equally available to all voters." Appellants' Br. at 30.

Employing the first Collins factor, and contrasting the in-person and absentee voters, the plaintiffs generally contend that the photo identification requirement is not reasonably related to the inherent characteristics that distinguish these two classifications of voters. The Voter ID Law requires proof of identification for in-person voters but not for persons who vote by mailing in an absentee ballot. The plaintiffs argue that these two classifications are distinguished on the basis that mail-in absentee ballots require heightened security and that this difference does not rationally support imposing additional identification requirements upon in-person voters. They also assert that the preferential treatment accorded mail-in absentee voters is not reasonably related to the distinctions between the classes.

The first factor in the Collins analysis involves considering both the nature of the characteristics that distinguish the classes and the relationship between the disparate treatment and such characteristics. Under this first factor, a statute may result in different treatment for different classifications of people without offending Section 23 if both (a) the disparately treated classifications are rationally distinguished by distinctive, inherent characteristics, and (b) such disparate treatment is reasonably related to such distinguishing characteristics. Ledbetter v. Hunter, 842 N.E.2d 810, 813 (Ind. 2006); Collins, 644 N.E.2d at 79.

The plaintiffs first compare the classifications of in-person voters with mail-in absentee voters. These two classifications are principally distinguished by the fact that an in-person voter, unlike a mail-in absentee voter, personally appears before election officials who can verify the identity of the person seeking to cast a vote. The plaintiffs urge that the photo identification requirement for in-person voters does not reasonably relate to the inherent differences between in-person voters and mail-in absentee voters.

The plaintiffs argue in part that, because the nature of absentee ballots requires a heightened security, the imposition of higher identification security on in-person voters is not reasonably related to the

14

differences between the classifications. This interest in heightened security may be of particular concern in the regulation of absentee voting, but it is not determinative on the issue presented. The plaintiffs argue that the special treatment provided to mail-in absentee voters "do[es] not support the claimed purpose of the Photo ID Law." Appellants' Br. at 32. But such focus on the "purpose" of the Law is not determinative. As we noted in Dvorak v. City of Bloomington, 796 N.E.2d 236 (Ind. 2003), Collins "requires only that . . . 'the disparate *treatment* accorded by the legislation,' not the *purposes* of the legislation, 'be reasonably related to the inherent characteristics which distinguish the unequally treated classes.'" Dvorak, 796 N.E.2d at 239 (quoting Collins, 644 N.E.2d at 79).

More significantly, other critical attributes distinguish the identified disparately treated classes, especially the practicability of requiring and efficaciously utilizing photo identification for mail-in absentee voters, in contrast to in-person voters. For ballots received by mail, there is no opportunity for an election official to personally compare the voter with the voter's photo identification to verify identity. Absentee ballots "reach the hands of election officials outside of the confines of the Election Day polling place." Horseman v. Keller, 841 N.E.2d 164, 172 (Ind. 2006). The plaintiffs do not propose any method by which a photo identification requirement could be effectively utilized to verify the identity of a mail-in absentee voter. Legislation is not constitutionally deficient for failing to impose an unenforceable, useless requirement. We find that not requiring photo identification for mail-in absentee voters is reasonably related to the inherent distinctions between such voters and those voting in person. We decline to find that the Voter ID Law's failure to require photo identification of mail-in absentee voters violates the Indiana Equal Privileges and Immunities Clause.

The plaintiffs assert multiple arguments with respect to the Voter ID Law's provision regarding certain voters living and voting in state licensed care facilities. One of the statutes comprising the Voter ID Law provides: "A voter who votes in person at a precinct polling place that is located at a state licensed care facility where the voter resides is not required to provide proof of identification before voting in an election." Ind. Code § 3-11-8-25.1(e). This provision serves as a basis for the plaintiffs to claim a Section 23 violation under both Collins factors.

Using the first factor of the Collins methodology, the plaintiffs assert that the statute violates Section 23 by permitting residents of state licensed care facilities to vote at their residence without photo

15

identification while requiring such identification as a prerequisite to voting by other seniors living elsewhere. They argue that "the distinctions between in-person senior citizen voters are not reasonably related to the different treatment accorded by the [Voter ID] Law." Appellants' Br. at 40. The plaintiffs also employ the second Collins factor, arguing that the statute grants preferential treatment to residents of certain state licensed care facilities but "does not grant similar relief to the elderly who are able to remain out in the community but who would have the same difficulties in procuring the requisite identification." *Id.* at 43. The plaintiffs thus assert that such privileged classification is not "open to any and all persons who share the inherent characteristics [that] distinguish and justify the classification" nor is the "particular classification . . . extended equally to all such persons." *Id.* at 42–43 (internal citation omitted).

The relief sought by the plaintiffs is that the entire Voter ID Law be declared unconstitutional, not the overturning of the special exception for voters living in state licensed care facilities that serve as precinct polling places on election day. In light of the relatively extremely small number of voters excluded from the photo identification requirement under this exception, even if arguably violative of Section 23, we find that it represents a minor and insubstantial disparity permissible under Section 23. *See* Dvorak, 796 N.E.2d at 240. We explained in Dvorak that, in applying Section 23, "[e]xact exclusion and inclusion is impractical," and noted the following observation from Collins:

> It is almost impossible to provide for every exceptional and imaginary case, and a legislature ought not to be required to do so at the risk of having its legislation declared void, even though appropriate and proper as applied to the general subject upon which the law intended to operate.

796 N.E.2d at 240 (quoting Collins, 644 N.E.2d at 80 (quoting Cincinnati, Hamilton & Dayton Ry. Co. v. McCullom, 183 Ind. 556, 561, 109 N.E. 206, 208 (1915))). Applying Dvorak, we find that granting a special privilege to residents of state licensed care facilities to vote at their residence without photo identification constitutes only a minor insubstantial variation that does not render sufficient disparate treatment to warrant judicial invalidation under Section 23.

Finally, in determining whether Section 23 is violated, we "must exercise substantial deference to legislative discretion." Collins, 644 N.E.2d at 80. Given the scope of the undertaking embraced in the Voter ID Law's efforts in enhancing the integrity of the electoral process and its attempt to tailor its operation to a significant variety of circumstances, we conclude that the possible absence of precise congruity in application to all voters represents a legitimate exercise of legislative discretion warranting our deference.

16

## Conclusion

We conclude that it is clear on the face of the complaint that the plaintiffs, as a matter of law, are not entitled to the relief sought. It is within the power of the legislature to require voters to identify themselves at the polls using a photo ID.

This result may contrast with a somewhat analogous case in our sister state of Missouri, Weinschenk v. State, 203 S.W.3d 201 (Mo. 2006). In that case, particular voters sued to block enforcement of a 2006 Missouri statute requiring registered voters to present certain types of photo ID to vote. Ms. Kathleen Weinschenk and the others claimed that the new law required them and other voters—particularly those who are low-income, disabled, or elderly, and who do not have driver's licenses—to spend money to obtain the necessary documents such as birth certificates in order to obtain the requisite photo ID in violation of the Missouri Constitution's provisions relating to equal protection and the right to vote. *Id*. at 204.[13] The Missouri Supreme Court held that while "there is a compelling state interest in preventing voter fraud, the evidence supports the trial court's conclusion that the Photo-ID Requirement is not narrowly tailored to accomplish that purpose." *Id*. Accordingly, it found the statute unconstitutional. *Id*.

Not only do the constitutions of Indiana and Missouri vary, but also our statute differs from Missouri's—notably, a requisite photo ID can be obtained from the Indiana Bureau of Motor Vehicles at no cost, Ind. Code § 9-24-16-10—and we do not mean to suggest that the facts present in the Missouri case would necessarily warrant declaring the Indiana Voter ID Law unconstitutional. But we do not foreclose

---

[13] Weinschenk, the first named plaintiff, did not have a birth certificate, had been born in another state, and was a person with cerebral palsy who alleged that obtaining a proper photo ID would be a substantial burden. Another named plaintiff, William Kottmeyer, had limited mobility, making it difficult for him to gather the necessary documents to obtain a non-driver's license and to stand in line at the Department of Revenue. Another named plaintiff, Robert Pund, has a physical condition that required him to arrange transportation to and from the Department of Revenue and to employ an attendant to assist him in order to obtain a non-driver's license. Another named plaintiff, Amanda Mullaney, was born in another state, and her current name did not match the name on her birth certificate because her parents were not married at the time of her birth, requiring proof of name change by means of either a certified court order or a certified amended birth certificate. Another named plaintiff, Richard von Glahn, unsuccessfully attempted to obtain a non-driver's license because he did not have the required $11 fee. He also lacked a birth certificate, for which the state of his birth (Ohio) would have charged him $20. Another named plaintiff, Maudie Mae Hughes, was born in another state (Mississippi), but the state had repeatedly informed her that it did not have any record of her birth, thereby compounding her difficulties in obtaining the photo ID necessary to vote in Missouri. *Id*. at 209.

such as-applied claims. Here the plaintiffs seek a declaration that it is unconstitutional to require voters to identify themselves at the polls using a photo ID. This is relief to which the plaintiffs are not entitled. But in affirming the trial court, we do so without prejudice to future particularized as-applied claims.

We affirm the judgment of the trial court granting the appellee's motion to dismiss and rejecting the plaintiffs' claims that the Indiana Voter ID Law contravenes Article 2, Section 2 or Article 1, Section 23 of the Indiana Constitution.

Shepard, C.J., and Sullivan and Rucker, JJ., concur. Boehm, J., dissents with separate opinion.

**Boehm, Justice, dissenting.**

I respectfully dissent. In broad brush, the issue in the federal constitutional challenges to Indiana's voter identification law was whether the burdens this requirement imposed on some citizens' right to vote were severe enough to overcome the presumption we give to all acts of the General Assembly. The Supreme Court of the United States resolved that issue against the plaintiffs, at least as far as any provision of the Federal Constitution is concerned. Crawford v. Marion County Election Bd., 128 S. Ct. 1610, 1615 (2008). The majority for the most part addresses this case as if that were the issue before us today. The majority categorizes the voter ID requirement as a regulation implementing the registration requirement and concludes that a regulation is valid if "reasonable and uniform." The majority dismisses the acknowledged problems that some voters may have in obtaining a voter ID as justified by perceived benefits in the integrity of the election.

As I see it, the state constitutional claim is quite different. The principal issue in this case is not a balancing of the relative benefits, if any, of a voter ID requirement against the problems that requirement creates for some citizens, if perhaps relatively few. The central question is who gets to resolve that issue under the Indiana Constitution. Under our Constitution some issues are immunized from revision by the temporary majority that comprises one session of the legislature, and must be addressed by the more deliberate and time consuming process of constitutional amendment. Article 16 of the Indiana Constitution permits amendment of the Constitution by agreement of a simple majority of each house in two successive General Assemblies, followed by approval by the voters of this state. This process is far less difficult than the approval by two-thirds of each house of Congress and ratification by three-quarters of the state legislatures needed to amend the Federal Constitution. U.S. Const. art. V. But it nonetheless represents the decision of the framers of our State Constitution to reserve some issues from the normal legislative process and require a more deliberative process, more extended debate, and a consensus over a longer period of time than is needed for ordinary legislation.

One of the subjects that the Indiana Constitution reserves to the amendment process is the "qualifications" for voting. The question in this case is whether our State Constitution permits one session of the General Assembly to impose a voter ID requirement on Indiana voters, or requires that two successive sessions of the legislature agree that this measure is necessary, and then submit it to the voters for the people to make the final decision. For the reasons given below, I think both precedent and the language of the Indiana Constitution dictate that the voter ID requirement is an unauthorized qualification

for casting a ballot. That requirement therefore can be imposed only if two successive sessions of the General Assembly and the voters of this state agree it is appropriate.

Article 2, Section 2 of the Indiana Constitution, entitled "Voting Qualifications," provides that "A citizen of the United States, who is at least eighteen (18) years of age and who has been a resident of a precinct thirty (30) days immediately preceding an election may vote in that precinct in the election." This section prescribes three, and only three, qualifications to vote: citizenship, age of eighteen or more, and residence in the precinct. It is quite different from the provisions of the 1851 Constitution, which limited voting to males, required that voters be 21 years of age, and imposed much longer residency requirements. Importantly, until 1881, even registration of voters was not authorized by the Indiana Constitution. Registration is now constitutional, but that hook does not support the voter ID requirement, and there is no other basis in the Constitution to deny voting rights to those unable to produce a voter ID.

Over the years the Constitutional provisions relating to voting have been amended on five different occasions, for the most part relaxing eligibility requirements and expanding the right to vote to groups previously excluded. Ind. Const. Ann. art. 2, § 2, at 392–93 (West 2007). For our purposes the most important of these is Amendment 3, one of a group of nine constitutional amendments that were first submitted to the voters in the 1880 spring election but had been declared invalid in State v. Swift, 69 Ind. 505 (1880), for failure to receive the required voter approval. Amendment 3 was resubmitted and ultimately adopted in 1881. For the first time it added to the Indiana Constitution the power of the General Assembly to require registration of voters. That authority is found today in Article 2, Section 14(c), which provides in its entirety: "The General Assembly shall provide for the registration of all persons entitled to vote." The need for an explicit constitutional authority to support the registration requirement was set forth in Governor Porter's recommendation that the General Assembly resubmit the invalidated amendments to the voters. House Journal, Fifty-Second Session, 81, quoted in 2 Charles Kettleborough, Constitution Making in Indiana 178–80 (1916). After noting the potential for voter fraud without registering voters before the election, the Governor explained that the Indiana Constitution alone sets the requirements for voter eligibility, and the 1851 Constitution did not authorize a registration requirement. Id. at 178–79. As a result, without the proposed amendments, "No registration law can be passed; the Constitution will not allow one." Id. at 179. In short, the voter registration we all accept today is itself a qualification for voting that requires specific constitutional validation. The courts have repeatedly confirmed Governor Porter's view that the legislature cannot impose qualifications for voting

2

beyond those prescribed by the Constitution. E.g., Fritch v. State, 199 Ind. 89, 92, 155 N.E. 257, 258 (1927) ("When the Constitution defines the qualifications of voters such qualifications cannot be changed nor added to by statute."); Morris v. Powell, 125 Ind. 281, 287, 25 N.E. 221, 223 (1890) (invalidating as a qualification a requirement that voters absent from the state for six months produce a certificate of property ownership).

The majority finds the voter ID to be a reasonable implementation of the registration requirement. The problem, of course, is that the plaintiffs claim that some eligible citizens are unable or unwilling for various legitimate reasons to obtain a voter ID, particularly in light of the recent restrictions designed to address national security concerns. We ordinarily give wide latitude to legislative judgment on matters of reasonable relationship in classifications created by statute. But any limitation on the right to vote surely strikes at one of the core values embodied in the Indiana Constitution. As Justice Mitchell of this Court put it 120 years ago:

> Those provisions of the constitution which define the right of suffrage, and prescribe the qualifications of persons entitled to its exercise, and those statutes which look to the guarding of the purity of elections, and the integrity of the ballot-box, demand the gravest and most deliberate consideration whenever they are drawn into judicial discussion.

Morris, 125 Ind. at 297, 25 N.E. at 229. Legislation governing who can vote, and how, is a product of a legislature that depends on elections. Only the judiciary can preserve the rights of the citizens against dilution by the elected branches of government. To borrow a phrase from federal jurisprudence, whether a matter is properly viewed as a registration requirement validated by Article 2, Section 14 therefore requires "strict scrutiny." The voter ID does not pass that test because, at least as alleged in the complaint, it requires satisfying conditions designed to meet other regulatory purposes and thereby imposes conditions on voting not authorized by the registration provisions.

To the extent language from Simmons v. Byrd, 192 Ind. 274, 136 N.E. 14 (1922), suggests a more deferential standard of review of legislation imposing requirements in the guise of regulating the registration process, I believe that opinion went significantly further than the facts of that case required and should not be followed. The only issue in that case was the validity of registration requirements that have long been accepted in this state and are minimally necessary to operate a registration plan as Article 2 of the Indiana Constitution has authorized since 1881. The law in question dealt largely with the mechanics of registration and required of the voter only that the voter be registered, which could be

accomplished in person or by mail or by delivery by another voter on the days designated, or by mail to the county auditor for delivery. To the extent the Simmons opinion suggested other more onerous requirements were permissible as registration regulations unless compliance was "practically impossible," it is dicta and should not be followed here. Id. at 286, 136 N.E. at 18.

The voter ID law before us today was passed 125 years after the Indiana Constitution was amended to authorize registration of voters. It enjoys no constitutional footing beyond the authorization in Section 14(c) to "provide for the registration of all persons entitled to vote." The issue, then, is whether that section authorizes the General Assembly to impose the requirement that every voter present a state-issued photo ID. Otherwise put, the issue is whether the requirement that a photo ID be presented at the polling station is merely a registration requirement. We are told that Indiana's voter ID law imposes more stringent requirements than those demanded by any other state. Brief for Lawyers' Committee for Civil Rights Under Law at 12–13. That alone does not establish the plaintiffs' claim, but, as explained below, plaintiffs have alleged facts that, if established, demonstrate that the voter ID requirement goes beyond the demands of a registration scheme. If so, it violates the Indiana Constitution, and plaintiffs are entitled to their day in court to establish that claim.

This case comes to us as the grant of a motion to dismiss the complaint for failure to state a claim. We therefore accept the allegations of the complaint as true. Noblesville Redevelopment Comm'n v. Noblesville Assocs., 674 N.E.2d 558, 562 (Ind. 1996). Plaintiffs allege that not all registered voters possess a valid photo ID, and the photo ID requirement has prevented or discouraged an indeterminate number of voters from casting a vote that counts. Plaintiffs cite instances of voters who present themselves at the polls without a photo ID and are allowed to cast a provisional ballot, but then are unable or unwilling to complete the process required within the next ten days for the vote to be counted. Plaintiffs also allege other instances where registered voters have simply been turned away for lack of a photo ID. These allegations are sufficient in my view to survive a motion to dismiss the complaint. Moreover, in their briefs plaintiffs elaborate on the bare bones of their complaint to allege that compliance with the requirements for a photo ID is not a simple process for every voter, and that recent steps designed to enhance the driver's license and photo ID have further complicated that process. For example, voters who have remarried in another state, or were not born in a hospital, may face extreme difficulty in obtaining a voter ID in their current name. If so, the voter ID law goes beyond regulating the process of election, and disqualifies voters whom the Indiana Constitution declares to be eligible to vote.

The photo ID cannot be justified as a registration requirement for a second reason: some of the restrictions placed on obtaining a state-issued ID do not address the legitimate concerns of preventing voter fraud. The process of obtaining a photo ID is the product of a regulatory scheme that has nothing to do with voter fraud. Its requirements were originally designed to regulate motor vehicle operators, and have now been expanded to include elaborate provisions aimed at limiting access to many facilities, for example commercial air travel, for national security reasons. Moreover, a photo ID is not required in the process of registering to vote, nor is a photo ID provided to a person who registers to vote. Crawford, 128 S. Ct. at 1614; Ind. Election Div., 2010 Indiana Voter Registration Guidebook 8–21. But it is available to persons who are not citizens or are under the age of eighteen and cannot vote. And the photo ID is required to have an expiration date. These provisions, designed to assure competence of motor vehicle operators, render the photo ID overinclusive as a voter registration requirement. It is also underinclusive because, in addition to carrying burdens unnecessary to a voter registration law, it fails to address the most obvious potentials for abuse of the registration process. To the extent we have instances of voter fraud, they have been in the use of absentee ballots that are not subject to the photo ID requirement, not in instances of voters appearing at the polls claiming to be someone they are not. Pabey v. Pastrick, 816 N.E.2d 1138, 1140–41 (Ind. 2004) (finding "a deliberate series of actions" that "perverted the absentee voting process"); see also Crawford, 128 S. Ct. at 1618–19 ("The record contains no evidence of any [in-person voter impersonation] actually occurring in Indiana at any time in its history."). The parties cite not a single instance of a voter appearing at the polls only to find that someone else has already cast his or her ballot. These problems, to the extent they exist, can be addressed as some other states have done by requiring some reliable evidence that the person shown on the registration lists still resides at the address shown on the polls. This can be done by producing utility bills and bank statements, as some states have done, or the traditional Indiana solution of requiring an affidavit from a challenged voter that the person is who he or she claims to be.

I also find problems in the majority's analysis of the plaintiffs' claim that the voter ID statute violates the Equal Privileges and Immunities Clause found in Article 1, Section 23 of the Indiana Constitution. That Clause provides

> The General Assembly shall not grant to . . . any class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.

On its face, the voter ID law grants a privilege—voting without a photo ID—to some classes of citizens, but not to all. The majority dismisses some of the plaintiffs' claims as insubstantial because only a small percentage of voters are in the favored classifications. But a small number of voters can determine the outcome of an election, as the national experience with the 2000 Florida presidential election demonstrated so dramatically. And even if the majority were correct that the statute may be saved because it disenfranchises only a few voters, there is nothing in this record that permits us to determine the number of affected voters. Most importantly, I believe we all have an interest in a full and fair electoral process, and the right to vote is of value only if others are granted equal access to the polling booth. A statute that wrongly denies any group of citizens the right to vote harms us all, and therefore may properly be challenged as invalid in its entirety, not merely as to those directly affected. Thus I do not agree with the majority that the remedy the plaintiffs seek here—invalidating the voter ID requirement—is beyond their grasp.

The majority does not address the plaintiffs' claim that the voter ID requirement violates Section 23 because it imposes substantially greater burdens on some citizens than it does on others. This claim also presents an issue for trial. We have recognized that "a statute that is constitutional on its face may be unconstitutional as applied to a particular plaintiff." Humphreys v. Clinic for Women, Inc., 796 N.E.2d 247, 257 (Ind. 2003). That doctrine has been held specifically applicable to claims under Section 23. Id. at 258. I think it is clear that a statute need not create the classification in order to violate Section 23 by conferring privileges on some citizens that are not available to all. To illustrate that point, consider a statute that provides that all voters must transport themselves to the polls on foot, but excludes from that requirement persons in wheelchairs and those over eighty years old. On its face these exclusions are reasonable, but the statute nonetheless has a dramatically different effect on persons who live at remote locations from the polling booth. Ordinarily a claim of unconstitutionality by reason of uneven impact on different persons would sustain a claim of relief only by the adversely affected individuals.

As a final point, because the majority finds the law constitutional, the majority is not required to address the State's contention that these plaintiffs do not have standing to challenge the voter ID law, and does not do so. I believe all citizens have the standing to attack a statute that unconstitutionally denies any voter the right to exercise his or her electoral franchise. We all have an interest in an election that is lawful, and the right to vote is meaningful only if others of like mind are also entitled to vote according to the Constitution. Indeed, it is difficult to conceive of a right that is more clearly a "public right" than the

right to vote and participate in a lawful election. It therefore may be enforced under the public standing doctrine long recognized by this Court and most recently reconfirmed in Cittadine v. Department of Transportation, 790 N.E.2d 978 (Ind. 2003).

In sum, the plaintiffs' allegations of substantial impediments to the exercise of the right to vote are sufficient to withstand a motion to dismiss the complaint. I would remand this case to permit the plaintiffs to attempt to prove their case.

**ATTORNEYS FOR AMICI CURIAE**

**BRIEF OF PROFESSORS MADISON, LEVINSON, AND ETCHESON IN SUPPORT OF APPELLANTS**

Andrew Mallon
Drewry Simmons Vornehm, LLP
Indianapolis, Indiana

Craig A. Cowie
Carrie F. Apfel
Daniel I. Weiner
James C. Cox
Jenner & Block LLP
Washington, DC

**BRIEF OF LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW IN SUPPORT OF APPELLANTS**

Jon M. Greenbaum
Robert A. Kengle
Lawyers' Committee for Civil Rights Under Law
Washington, DC

Kathleen M. Sweeney
Schembs Sweeney Law
Indianapolis, Indiana

Sri Srinivasan
Charles E. Borden
Micah W.J. Smith
O'Melveny & Myers LLP
Washington, DC

**BRIEF OF LONNA RAE ATKESON, MATT A. BARRETO, LORRAINE C. MINNITE, JONATHAN NAGLER, STEPHEN A. NUÑO AND GABRIEL RAMON SANCHEZ IN OPPOSITION TO DEFENDANT'S PETITION TO TRANSFER**

A. Douglas Stephens
Clermont, Indiana

**BRIEF OF AARP AND NATIONAL SENIOR CITIZENS LAW CENTER IN SUPPORT OF APPELLANTS**

Daniel B. Kohrman
AARP Foundation Litigation
Washington, DC

Brenda Wright
Demos: A Network for Ideas & Action
Brighton, Massachusetts

John W. Borkowski
Hogan & Hartson L.L.P.
South Bend, Indiana

Joshua D. Weinberg
Hogan & Hartson L.L.P.
Washington, DC

**BRIEF OF LEAGUE OF WOMEN VOTERS OF THE UNITED STATES**

Michael K. Sutherlin
Michael K. Sutherlin & Associates, PC
Indianapolis, Indiana

Lloyd Leonard
League of Women Voters of the United States
Washington, DC

Michael H. Jacobs
Justine E. Daigneault
Crowell & Moring LLP
Washington, DC

Amy T. Tridgell
Crowell & Moring LLP
New York, New York

**BRIEF OF AMICI CURIAE**

Eric Koselke
Indianapolis, Indiana

M. Laughlin McDonald
American Civil Liberties Union, Inc.
Voting Rights Project
Atlanta, Georgia

Anita Earls
Southern Coalition for Social Justice
Durham, North Carolina

**BRIEF OF THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. IN OPPOSITION TO DEFENDANT'S PETITION TO TRANSFER**

NAACP Legal Defense & Educational Fund, Inc.
New York, New York

NAACP Legal Defense & Educational Fund, Inc.
Washington, DC